(April 25, 2017)

■ VIKTOR GECAJ, Appellant, v GJONAJ REALTY & MANAGEMENT CORP. et al., Respondents. [51 NYS3d 74]—

Order, Supreme Court, Bronx County (Julia I. Rodriguez, J.), entered November 18, 2015, which granted defendants' motion to vacate a default judgment entered against them and set aside the assessment of damages after inquest, modified, on the law, the facts, and in the exercise of discretion, to the extent of denying the motion to vacate the default judgment, and remanding the matter for a new inquest to determine plaintiff's damages, and otherwise affirmed, without costs.

The motion to vacate the default judgment should not have been granted since defendants failed to demonstrate a reasonable excuse for their delay in appearing. The record shows that plaintiff commenced this action by verified complaint dated December 27, 2010. An affidavit of service for defendant 28-47 Webb Realty Associates, LLC (Webb), dated January 19, 2011, indicates that service was made on January 18, 2011 upon the Secretary of State. An affidavit of service for defendant Gjonaj Realty & Management Corp. (Gjonaj), dated January 21, 2011, indicates that service was made on January 20, 2011 upon Maria Gjonaj, the managing agent for defendant Gjonaj. A second affidavit of service for Gjonaj dated June 10, 2011 indicates that service was personally made upon "Jane Smith," a managing agent who refused to give her name, on June 2, 2011.

In his complaint, plaintiff alleges that defendants retained plaintiff's employer to install cameras at the premises located at 28-47 Webb Avenue in the Bronx. Plaintiff further alleges that he was injured on May 7, 2010 when he fell from a defective ladder while performing work for his employer. Plaintiff contends that defendants violated Labor Law §§ 200, 240, 241 (6) and 241-a, and sections of the Industrial Code, and that by reason of such violations and defendants' negligence, he was severely injured.

After receiving no answer from either party, plaintiff moved by notice of motion dated December 26, 2011 for a default judgment, pursuant to CPLR 3215, which was denied on March 26, 2012, without prejudice, for plaintiff's failure to submit an affidavit of merit in support of the motion and to demonstrate that it complied with the follow-up mailing requirement of CPLR 3215 (g) for defendant Webb. An affidavit of service, dated July 16, 2013, indicates that the order denying plaintiff's motion for a default judgment, along with notice of entry, were served on defendants pro se, via mail, on July 16, 2013. Thereafter, on or

about October 8, 2013, plaintiff renewed his motion for a default judgment, which was granted on November 22, 2013, and an inquest was directed. On December 11, 2013, plaintiff pro se served the notice of entry of the default judgment on defendants. On February 12, 2014, defendants received a letter from the court in connection with the case.[1] On September 23, 2014, the court conducted the inquest and granted plaintiff an award of $900,000. Notice of entry of the award was served on defendants on or about October 20, 2014.

It was not until December 10, 2014, over 4½ years after the accident occurred, and almost four years since the action was commenced, that defendants finally moved, pursuant to CPLR 5015, to vacate the default judgment and to serve and file a late answer. The motion was supported by an affidavit from defendants' principal, Viktor Gjonaj (Mr. Gjonaj), an affirmation from Y. Albert Dauti, defendants' attorney, and an affidavit from David Sarasky, an insurance broker with ARM-Capacity of New York, LLC (ARM), who was ARM's designated representative to handle liability insurance coverage matters for defendants.

The motion court vacated the default judgment and granted defendants leave to serve and file the proposed verified answer with affirmative defenses, finding that defendants had presented a reasonable excuse for their default, that their default was not intentional, and that they had a meritorious defense to plaintiff's claims. Further, the motion court noted that it is "the preferred policy of the First Department to dispose of cases on their merits."

We agree that "[w]hat constitutes a reasonable excuse for a default generally lies within the sound discretion of the motion court" (*Rodgers v 66 E. Tremont Hgts. Hous. Dev. Fund Corp.*, 69 AD3d 510, 510 [1st Dept 2010]). We also agree that "there exists a strong public policy in favor of disposing of cases on their merits" (*Johnson-Roberts v Ira Judelson Bail Bonds*, 140 AD3d 509, 509 [1st Dept 2016]). However, the Appellate Division has the ability and authority to substitute its own discretion for that of the motion court, even in the absence of a finding of abuse of discretion (*Alliance Prop. Mgt. & Dev. v Andrews Ave. Equities*, 70 NY2d 831, 833 [1987] [finding that the "Appellate Division is, of course, vested with the same power and discretion as Special Term, and can review a determination for abuse of discretion or substitute its own discretion"]). Here,

---

1. This letter is not part of the record and defendants do not describe its contents. However, defendants' principal stated in his affidavit that he received a letter from the court on this date.

under all the circumstances of this case, we disagree with the motion court and find that defendants failed to present a reasonable excuse for their default (*see* CPLR 5015 [a] [1]). "Whether there is a reasonable excuse for a default is a discretionary, sui generis determination to be made by the court based on all relevant factors" (*Harcztark v Drive Variety, Inc.*, 21 AD3d 876, 876-877 [2d Dept 2005]). We respectfully do not believe that the motion court correctly considered all the "relevant factors" in this particular case, and thus we reach the opposite conclusion.

Defendants' principal, a successful business person, owning over 15 multiple-dwelling properties, affirmed that he was served with "numerous legal papers on this matter," copies of which he would forward to his insurance broker. Specifically, defendants' principal affirmed that he received the summons and complaint, both motions for a default judgment, a letter from the court, and a decision from the court containing a reference to a $900,000 judgment against his companies. Each time, he allegedly provided a copy of the respective document to his insurance broker, upon whom he relied to send the document to the appropriate insurance carrier. And each time, the insurance broker assured Mr. Gjonaj that "everything in this matter was under control," and the "claim was being handled by the proper insurance company." However, defendants did not take any further action to determine if the insurance carrier was in fact responding to plaintiff's claims, notwithstanding Mr. Gjonaj's receipt of numerous documents directly from plaintiff's counsel over the course of more than three years. It was not until October 2014, when Mr. Gjonaj received the decision granting plaintiff a monetary award, that he finally became "alarmed and reached out to an attorney," and even then, despite being "alarmed," it took an additional two months for defendants to file their motion to vacate the default.[2]

Sarasky affirmed that his practice was to provide the documents to the claims department, to then be sent to the insurance carrier for defendants. However, as it turns out, the documents were mistakenly being sent to the wrong insurance carrier (who apparently never notified the broker or the defendants of the mistake), and thus, no one was ever appointed to appear for defendants in this action.

---

2. This two-month gap, however, is not, as the dissent would suggest, the straw that broke the camel's back. Rather, it is the totality of defendants' conduct that renders their excuse unreasonable here. To be clear, we are in no way, silently or otherwise, acknowledging that defendants' reliance on the assurances of the broker that the matter was being defended was excusable under these circumstances, thus warranting vacatur of the default.

While we concede that, generally, when a defendant provides the summons and complaint to its insurance broker, and the insurer, thereafter, fails to appoint counsel to appear in the action on behalf of defendant, this is considered to be a reasonable excuse (*see generally Rodgers*, 69 AD3d at 510-511). However, on the facts presented here, defendants did not establish a reasonable excuse for their default. An assertion by a defendant that it believed its insurer "was providing a defense is unsubstantiated and unreasonable in light of [the defendant's] conceded receipt of the plaintiff's motion for leave to enter a default judgment," as receipt of such a motion puts the defendant on notice that the insurer has, in fact, *not* answered the complaint since the commencement of the action (*Trepel v Greenman-Pedersen, Inc.*, 99 AD3d 789, 791 [2d Dept 2012]; *see also Spitzer v Landau*, 104 AD3d 936, 937 [2d Dept 2013] [finding that the defendant's belief that the insurer was providing a defense was "unreasonable given that the defendant was served with the plaintiff's motion for leave to enter a default judgment"]).

As in *Trepel v Greenman-Pedersen, Inc.*, Mr. Gjonaj's assertion in this case that he believed his broker was forwarding the paperwork to the appropriate insurance carrier was unreasonable in light of his conceded receipt of the summons and complaint, *two* motions for a default judgment, a letter from the court and a court decision reflecting a $900,000 judgment against him. Surely Mr. Gjonaj knew that if his insurance company had retained a lawyer to appear for defendants, he and his corporations would not have continued to receive legal documents directly from plaintiff's attorney and the court *for over three years*. The fact that Sarasky kept assuring Mr. Gjonaj "that everything in this matter was under control and that the claim was being handled by the proper insurance company," does not help to establish reasonableness, objective or otherwise, on the part of Mr. Gjonaj, who should have known that everything was *not* under control after years of receiving so many legal documents from plaintiff's counsel relating to the same lawsuit.

The dissent, however, would have us find that defendants presented a reasonable excuse for their delay because they forwarded all documents upon receipt to their insurance broker, and thus, were entitled to blindly rely on their belief that the insurer would take appropriate action. The cases cited by the dissent and the motion court in support of this proposition are readily distinguishable and do not dictate vacatur of the default judgment here. In *Romero v Alezeb Deli Grocery Inc.*

(115 AD3d 496 [1st Dept 2014]), cited by the motion court, the defendant received the summons and complaint, which was then forwarded to its insurance broker, who delayed in forwarding the pleadings to the carrier; there is no indication that the defendant ever received any papers from the plaintiff other than the initial pleadings. In *Rodgers*, also cited by the Supreme Court, the defendant denied ever being served with process, and upon receiving a letter from the plaintiff's counsel containing a copy of the pleadings, immediately forwarded the correspondence and pleadings to its insurer (69 AD3d at 510-511). In the third case cited by the motion court, *Price v Boston Rd. Dev. Corp.* (56 AD3d 336 [1st Dept 2008]), the court found that the defendant demonstrated that it did not receive notice of the action until its former managing agent was personally served with the plaintiff's motion for a default judgment, and that the prompt action the defendant took after receiving notice of the plaintiff's motion suggested that it lacked actual notice of the summons and complaint. These facts, where the defendants reacted promptly to their defaults, are very different from the facts in this case, where defendants continued to receive documents from plaintiff's counsel and the court for over three years after the pleadings were served, clearly rendering any reliance on the mere act of forwarding the documents to the broker or insurance carrier unreasonable (*see also Lirit Corp. v Laufer Vision World*, 84 AD2d 704, 704 [1st Dept 1981] [the defendant's default was reasonable where an "employee who received the summons mailed it to the insurance broker and it somehow was never heard of again," *and thereafter, at the "first indication defendant had that there was a default . . . defendant promptly moved to vacate it"* (emphasis added)]; *Heskel's W. 38th St. Corp. v Gotham Constr. Co. LLC*, 14 AD3d 306 [1st Dept 2005] [finding that the defendant forwarded the summons and complaint to its insurer, who inadvertently failed to forward it to counsel, but once the plaintiff's counsel spoke to the adjuster and the error was discovered, the defendants served their answer, only 4½ months later]).

The remaining cases relied upon by the dissent are also distinguishable because the facts are so different from the present case (*see Mendoza v Bi-County Paving*, 227 AD2d 302, 303 [1st Dept 1996] [finding that the defendant offered a reasonable excuse for its default, when its broker misdirected the complaint to the wrong insurer who misplaced it, that settlement negotiations made it prudent to delay service of the answer, and then the defendants never received notice of the motions for a default judgment or of the ensuing orders]; *Price*

*v Polisner*, 172 AD2d 422, 423 [1st Dept 1990] [finding that neither the defendant nor the insurance carrier received notice of the motion for a default judgment until the order after inquest was served, and upon receipt of same, both the defendant and the insurance carrier took *prompt* action to seek relief]; *Wehringer v Kessler*, 56 AD2d 547, 548 [1st Dept 1977] [finding that the defendant denied "that he was served with a notice of default or any other papers before he received a copy of the default judgment," which was caused by the clerical oversight and inadvertence of his broker and/or his insurer, thus providing a reasonable excuse for the default]). Here, as already noted, Mr. Gjonaj confirmed that he received the summons and complaint, both motions for a default judgment, as well as a letter from the court and the decision after inquest, and thus, defendants did not and cannot allege that they failed to receive notice of any of the pleadings, motions, or orders filed in this action.[3]

To the extent the dissent, which criticizes our occasional citation of Second Department cases, relies so heavily on the Second Department case of *Fire Is. Pines v Colonial Dormer Corp.* (109 AD2d 815 [2d Dept 1985]), contending that it presents facts so similar to the case before us that it dictates affirming the motion court's decision to vacate the default judgment, the case is, in fact, distinguishable, in that the Second Department there found that "[u]nder the totality of the circumstances . . . presented" the motion court's refusal to vacate the default judgment entered against the defendant was an improvident exercise of discretion because, inter alia, the insured defendant had acted promptly to protect itself as soon as the insurer or broker forwarded a letter to the defendant disclaiming coverage for the loss sued upon, which was less than 11 months after the action was commenced. Here, there was no issue raised by the insurer or the broker as to coverage being disclaimed, and defendant did not act at all promptly to protect himself throughout the proceedings, waiting almost two months after receiving notice of entry of the $900,000 award to move to vacate the default judgment, which was also almost three years after receiving the first motion for a default judgment (*cf. Price v Polisner*, 172 AD2d at 423 [where the

---

**3.** While the particular facts of each one of these cases differ, the appellate courts, in every instance, in determining whether the motion court providently or improvidently exercised its discretion in vacating or failing to vacate a default based on reasonable excuse, or in substituting its own discretion, considered all the unique circumstances presented in that particular case.

court also found, as in *Fire Is. Pines*, that the defendant had acted promptly to protect himself]). Moreover, the *Fire Is. Pines* Court did not mention or make reference to a claim of prejudice by the plaintiff. The same cannot be said here, where plaintiff has, in fact, made a compelling argument that it will be prejudiced if the default is vacated, as discussed further below. Under all the circumstances presented here, we find that defendants failed to provide a reasonable excuse for their default.

Since we have concluded that defendants failed to set forth a reasonable excuse for their default, it is not necessary to consider whether defendants demonstrated a meritorious defense. However, in light of the dissent's contention that "it seems doubtful that there is any basis for a negligence or Labor Law § 200 claim against defendants," and that it is unclear whether plaintiff's work "falls within the scope of Labor Law § 240 (1)," we point out that although some of the causes of action claimed by plaintiff may not have survived, Mr. Gjonaj explicitly stated in his affidavit that he remembers hiring a company to do some "security camera work/repair at 28-47 Webb Avenue, Yonkers, NY, on or about May 7, 2010," which is the date of plaintiff's accident, when he claims to have fallen from a defective ladder. It is irrelevant that Mr. Gjonaj asserted in his affidavit that he never employed plaintiff, and that plaintiff has never been employed by any of the defendants.[4] These were not plaintiff's claims; rather, he alleges that his employer was hired by defendants to perform work at the premises at 28-47 Webb Avenue, so there would have been no reason for Mr. Gjonaj to have met plaintiff personally. Although Mr. Gjonaj claims that defendants never directed or supervised plaintiff's work, or provided him with a ladder and/or scaffold to do any work, plaintiff alleges that he was involved in repairing/installing security cameras at the premises when he fell from a defective ladder. This is sufficient to bring this case within the ambit of the Labor Law, and Mr. Gjonaj's claims that defendants never directed or supervised plaintiff's work, or provided him with a ladder and/or scaffold to do any work are irrelevant and unavailing.

Indeed, Labor Law § 240 "was enacted for the protection of workers from injury and 'is to be construed as liberally as may be for the accomplishment of the purpose for which it was thus framed' " (*Tate v Clancy-Cullen Stor. Co.*, 171 AD2d 292, 295 [1st Dept 1991], quoting *Zimmer v Chemung County Performing Arts*, 65 NY2d 513, 521 [1985]). Moreover, to the extent the

---

4. He also claims that he never met plaintiff.

dissent seeks to imply that plaintiff's installation of a security camera falls outside the purview of Labor Law § 240 (1) ("erection, demolition, repairing, altering . . . of a building or structure"), other courts have found to the contrary (*see e.g. Guzman v Gumley-Haft, Inc.*, 274 AD2d 555, 556 [2d Dept 2000] [finding that, on a motion for summary judgment, the plaintiff's work of removing and reinstalling a security camera was covered by Labor Law § 240 (1)]).

We find defendants' argument that they will be prejudiced if the default judgment is reinstated because their insurance carrier has disclaimed coverage, unavailing. In fact, a mere six days after filing the motion to vacate at issue here, defendants filed a summons and complaint against ARM, their insurance broker, for negligent misrepresentation. It is rather plaintiff who will be prejudiced by having to first attempt to conduct discovery relating to an accident that took place in May 2010, over 6½ years ago, and for which plaintiff filed a summons and complaint in December 2010. Moreover, and despite the dissent's attempt to create a burden where there is none, plaintiff was not required to claim that "his counsel made any inquiry of defendants to learn why they had not answered or otherwise appeared in the action." Although there was admittedly a delay on plaintiff's part in moving for a default judgment the first time, and then between the denial of plaintiff's first motion for a default judgment and the making of the second motion for a default judgment, this does not excuse defendants' behavior or warrant vacating the default judgment.

However, on this record, we find that the award of $900,000 after inquest appears to be excessive and the case should be remanded for a new inquest to determine plaintiff's damages (*see Neuman v Greenblatt*, 260 AD2d 616, 617 [2d Dept 1999]). The court's decision and order after inquest refers to MRI studies but does not state that the films were actually reviewed or admitted into evidence, or whether diagnostic testing was submitted at the inquest in support of plaintiff's additional claimed injuries. Indeed, plaintiff failed to annex any properly certified medical records or other proof of damages in opposition to defendants' motion. At the inquest, of course, defendant must have " 'a full opportunity to cross-examine witnesses, give testimony and offer proof in mitigation of damages' " (*Ruzal v Mohammad*, 283 AD2d 318, 319 [1st Dept 2001], quoting *Rokina Opt. Co. v Camera King*, 63 NY2d 728, 730 [1984]). Concur—Richter, Moskowitz and Kapnick, JJ.

Friedman, J.P., dissents in part in a memorandum as follows: Under the clear weight of authority in this Court, a

party's default is excusable under CPLR 5015 (a) (1) upon a substantiated showing that the party promptly forwarded all of the legal papers it received to its insurance broker or carrier, in reliance on the broker or carrier to take appropriate action, and that the default resulted from error on the part of the broker or carrier. Supreme Court, adhering to these precedents, exercised its discretion to grant defendants' motion to vacate the default judgment against them, based upon the affidavits of defendants' principal (Viktor Gjonaj) and of defendants' insurance broker (David Anthony Sarasky of ARM-Capacity of New York, LLC [ARM]), attesting that Gjonaj had forwarded to Sarasky at ARM all papers served in this action and had received assurances from Sarasky that the papers had been sent to the appropriate carrier, which was handling the matter. Unfortunately, however, ARM's claims department, unbeknownst to Gjonaj or Sarasky, had forwarded the papers to the wrong insurance company, resulting in the default from which Supreme Court relieved defendants in the order under review. As Sarasky candidly admits in his affidavit in support of the motion to vacate the default, "[I]t is not because of defendants' actions or inactions but it was due to the negligence of ARM and its Claims Department that defendants have defaulted in this action."

In his affidavit, Gjonaj identifies each paper defendants received in this action (the summons and complaint, a motion for default judgment, a second motion for default judgment, a letter from the court, and the decision awarding plaintiff damages) and the approximate date on which each document was received. Gjonaj further avers that, in the case of each such paper, he "immediately forwarded a copy" of the document to Sarasky, his insurance broker at ARM. Upon receiving the court's decision in October 2014, Gjonaj became "alarmed" when he "noticed that the Decision contained a reference to a $900,000 judgment against my companies." At that point, he sought legal counsel on his own. Gjonaj offers the following detailed explanation of his reliance on ARM (paragraph numbers omitted):

"I have a long term business relationship—over nine (9) years—with [ARM], who [sic] has procured, advised and handled all my insurance coverage needs for this and for other real estate properties owned/managed by myself and/or the corporate entities I own and/or manage.

"I own—through different corporate entities—over fifteen (15) multiple-dwelling properties and for the last nine years, it is ARM who [sic] has procured insurance coverage for numer-

ous properties I control/manage and has acted as the liaison between myself and the respective insurance companies. All my insurance needs and all my insurance matters have been handled by ARM. During the last nine years, whenever I needed insurance coverage for a property, I would reach out to ARM which would in turn shop around and choose an insurance company that would offer [the] best quote. I would simply proceed to pay the premium as per the [sic] ARM's instructions without even knowing which insurance company was providing insurance coverage for which property.

"During the almost-one-decade long business relationship with ARM, I have always forwarded any and all paperwork I have received regarding personal injury claims and/or any other claims and related notices and legal documents to ARM, which in turn has forwarded them to the insurance company with coverage for the respective location.

"During the almost-one-decade long relationship with ARM, I have always relied on the latter to forward any and all notices of claim, letters and legal papers I have received to the appropriate insurance company with coverage for the respective location."

Sarasky, defendant's insurance broker at ARM, submitted an affidavit corroborating Gjonaj's account in every respect. Sarasky avers (paragraph numbers omitted):

"I confirm that from January 21, 2011 through February 12, 2014, I have received numerous legal documents, from Victor Gjonaj, regarding [the] above-captioned matter—including but not limited to Summons and Complaint and Default Summary Judgment Motions.

"I also confirm that I forwarded these documents to our Claims Department to be sent to the insurance carrier for the defendants in this matter.

"I also confirm that each time I received the documents on this matter from Mr. Gjonaj, I forwarded them to our Claims Department and I assured Mr. Gjonaj that all was being taken care of.

"However, I figured out later that the documents were mistakenly being sent to the incorrect insurance company by one of our employees.

"During the last 8-9 years, we at ARM have purchased insurance coverage and handled the insurance claims paperwork for Mr. Gjonaj and for the numerous properties he controls. We have always forwarded the legal documents we received from Mr. Gjonaj to the proper insurance company, however, unfortu-

nately, in this case our Claims Department dropped the ball and they inadvertently kept sending everything to the wrong insurance company. I was under the impression that our Claims Department was doing what they always did in the past, i.e., that they were sending the paperwork to the proper insurance carrier, so I kept assuring Mr. Gjonaj that everything in this matter was under control and that the claim was being handled by the proper insurance company. Therefore, no Counsel was appointed to interpose an answer and defend the defendants in this action."

Now, in spite of our precedents establishing that a default such as defendants' is excusable (as more fully discussed below), the majority, disregarding Supreme Court's broad discretion in this matter, modifies to reinstate the default judgment against defendants as to liability. In so doing, the majority unsuccessfully attempts to distinguish the case law cited by Supreme Court, while relying on two readily distinguishable decisions, neither of which was issued by this Court. I believe that we should adhere to our applicable precedents and defer to Supreme Court's provident exercise of its broad discretion in determining that, under those precedents, the subject default was excusable (*see Harcztark v Drive Variety, Inc.*, 21 AD3d 876, 876-877 [2d Dept 2005] ["Whether there is a reasonable excuse for a default is a discretionary, sui generis determination to be made by the court based on all relevant factors"]; *accord Rickert v Chestara*, 56 AD3d 941, 942 [3d Dept 2008]; *see also Woodson v Mendon Leasing Corp.*, 100 NY2d 62, 68 [2003] [CPLR 5015 (a) codifies courts' "inherent discretionary power" to vacate default judgments (internal quotation marks omitted)]). Accordingly, I would affirm the order vacating the default judgment in its entirety, and respectfully dissent from the majority's modification to reinstate the default judgment as to liability.

Strangely, the majority quotes the statement from *Harcztark* that whether to excuse a default is "a discretionary, sui generis determination" (21 AD3d at 876) in support of its reversal, as a matter of law, of Supreme Court's making of precisely such "a discretionary, sui generis determination." Contrary to the majority's upside-down view of the law, the discretionary and sui generis nature of the inquiry indicates that an appellate court should not disturb Supreme Court's exercise of its discretion in cases where reasonable minds may differ on whether the default is excusable. The majority itself abuses this Court's discretion, and thus errs as a matter of law, in reversing Supreme Court's manifestly reasonable exercise of its discre-

tion merely to require plaintiff to prove his case, as contemplated in the ordinary course of litigation.

I am, of course, fully cognizant of this Court's power to substitute its own discretion for that of Supreme Court. However, to the extent the majority purports to exercise this Court's power to substitute its own discretion for that of Supreme Court, that power should be sparingly exercised, and I see no grounds for doing so here. In this regard, it seems to me that, in this case, it is the majority, and not Supreme Court, that has not (to quote the majority) "correctly considered all the 'relevant factors' " (quoting *Harcztark*, 21 AD3d at 876-877).

In the most recent case upon which Supreme Court relied, we stated, in affirming an order vacating a default judgment, that "[t]he unexplained delay of defendant's insurance broker in forwarding the summons and complaint to defendant's insurance carrier constituted a reasonable excuse for defendant's failure to appear" (*Romero v Alezeb Deli Grocery Inc.*, 115 AD3d 496, 496 [1st Dept 2014]). In another decision cited by Supreme Court, we affirmed the vacatur of a default judgment where it was the defendant's insurer that failed to act in response to timely notice by the defendant. In that case, we held that "it was reasonable for defendant to believe that its insurer would take the appropriate action to appear and defend the action" where the defendant, upon its admitted receipt of the pleadings, had "immediately forwarded the correspondence and pleadings to its insurer" (*Rodgers v 66 E. Tremont Hgts. Hous. Dev. Fund Corp.*, 69 AD3d 510, 511 [1st Dept 2010]). Supreme Court also cited *Price v Boston Rd. Dev. Corp.* (56 AD3d 336, 336 [1st Dept 2008]), in which we held that "[the defendant's] insurance carrier's failure to act timely does not preclude defendant from vacating an unintentional default" (*id.*).

The three cases cited by Supreme Court are not alone among this Court's precedents in holding excusable a default due to the error or inaction of the defaulting party's insurance broker or carrier, as occurred here (*see Heskel's W. 38th St. Corp. v Gotham Constr. Co. LLC*, 14 AD3d 306, 307 [1st Dept 2005] ["Excusable delay is sufficiently established since the failure to forward the complaint to counsel prior to December 1, 2003 was concededly due to the inadvertence of the insurer"]; *Mendoza v Bi-County Paving*, 227 AD2d 302, 302 [1st Dept 1996] ["Defendant offered a reasonable excuse for its default, namely, that its broker misdirected the complaint to the wrong insurer, (and) that its insurer then misplaced it"]; *Price v Polisner*, 172 AD2d 422, 423 [1st Dept 1991] [affirming vacatur of default

."where the insured defendant . . . acted promptly to protect himself," but the insurer failed to act]; *Lirit Corp. v Laufer Vision World*, 84 AD2d 704, 704 [1st Dept 1981] [the defendant's default was excusable where "the employee (of the defendant) who received the summons mailed it to the insurance broker and it somehow was never heard of again"]; *Wehringer v Kessler*, 56 AD2d 547, 548 [1st Dept 1977] [the defendant's default was excusable because "(i)t was caused by the clerical oversight and inadvertence of his broker and/or his insurer"]).

In *Fire Is. Pines v Colonial Dormer Corp.* (109 AD2d 815 [2d Dept 1985]), the Second Department found a default excusable on facts very similar to those presented here. The *Fire Island* defendant, upon being served with the summons and complaint on November 30, 1982, "immediately forwarded [them] to [its] insurance broker, who forwarded them to defendant's insurance carrier, while assuring defendant the carrier would retain counsel to defend the action. All subsequent papers in the action were similarly forwarded, with similar assurances passing from the broker to defendant. No answer was ever served on behalf of defendant. On October 6, 1983, plaintiff entered a default judgment against defendant, and defendant passed a copy of that judgment, with restraining notice, on to its broker, receiving assurances that defendant was covered for such loss. Not until October 25, 1983, did the carrier or broker indicate to defendant the existence of any question as to whether defendant's policy covered the loss in question" (*id.* at 816). On the defendant's appeal from the denial of its motion to vacate the default judgment, the Second Department reversed, explaining: "On this record, it cannot be said that defendant's reliance on its broker's assurances and its carrier's silence was not reasonable; therefore the default was excusable" (*id.*).[1]

The majority seizes upon various factual distinctions between the foregoing cases and this one, but does not come to grips with the fundamental principle they establish: that when a party receiving legal papers does not simply ignore them, but forwards them to an insurance broker or carrier, in reliance on the broker or carrier to take appropriate action, an ensuing default—even if the party's reliance on the broker or carrier

---

1. In asserting that I "rel[y] . . . heavily" on *Fire Island*, the majority ignores the fact that my position is supported, not only by that case, but by no less than seven of this Court's own decisions, as well as by the general principle of deference to Supreme Court's exercise of its own discretion and by the preference to decide actions on their merits. Meanwhile, the majority has apparently been able to locate only two decisions, neither decided by this Court, in which it claims to find support for its reversal of Supreme Court to foreclose defendants from contesting liability on the merits.

was not entirely reasonable—is excusable, subject to Supreme Court's discretion. The majority, however, apparently believes that if defendants' reliance on the assurances of their broker was not objectively reasonable in its entirety, their default cannot be excused, as a matter of law. The majority cites no case law in support of its position that any deviation from an objective standard of due care by a defaulting party is inexcusable. This omission is not surprising, since it is plain that the legislature's intent in enacting CPLR 5015 (a) (1) was to the contrary. The legislative report on the provision subsequently enacted as CPLR 5015 (a) (1) explains: "The words 'excusable default' are substituted for the present words *'mistake, inadvertance* [sic], surprise or *excusable neglect'* [in former Civil Practice Act § 108] *with no change in meaning intended"* (1959 NY Legis Doc No. 17 at 205 [emphasis added]). Thus, neglect that results in a default may be excusable under CPLR 5015 (a) (1) (*see* Weinstein-Korn-Miller, NY Civ Prac ¶ 5015.04). Here, Gjonaj's conduct in promptly sending the legal papers he received to his insurance broker, and then relying on the broker's assurances that the matter was being handled by the appropriate carrier, was perhaps less than astute, but he was acting in subjective good faith to address the matter, rather than simply ignoring it. If this was neglect, the neglect was excusable.

While, as the majority notes, Gjonaj apparently has attained some success in the real estate business, we have no information about his background that would justify presuming him to be sophisticated in matters of civil procedure. Thus, I strongly disagree with the majority's statement that Gjonaj "[s]urely . . . knew" that he would not have continued to receive legal papers concerning this action if a lawyer had been retained by the insurer. A lawyer surely would know that, of course, but not necessarily a layperson. Pertinent here is this Court's observation that "[i]t is not unusual for lay persons to mail process to an insurance company and not to be surprised to hear nothing from the broker or insurance company for some time" (*Lirit Corp.*, 84 AD2d at 704).

In reversing Supreme Court's discretionary determination that defendants' inadvertent default was excusable, the majority relies chiefly upon two cases, neither of which is from this Court, and both of which are readily distinguishable on the ground that, in each of them, the defaulting party's claim of reliance on the broker or insurer was conclusory and unsubstantiated (*see Spitzer v Landau*, 104 AD3d 936 [2d Dept 2013] [the defendant's claims to have believed that his broker had

forwarded the summons and complaint to his insurer, and that the insurer was providing a defense, were "unsubstantiated"]; *Trepel v Greenman-Pedersen, Inc.*, 99 AD3d 789, 791 [2d Dept 2012] [the defaulting defendant's "assertion that it believed that its insurer . . . was providing a defense is unsubstantiated"]). *Trepel* is rendered further inapposite by the fact that there is no indication that the defaulting defendant in that case received assurances from an insurance professional that the matter was being handled by the appropriate carrier, as Gjonaj obtained from Sarasky in this case. Moreover, the defaulting defendant in *Trepel* failed to appear at the inquest even though it had by that time received notice that its insurer had been declared insolvent (*id.* at 790, 791).

The unsubstantiated claims of reliance in *Spitzer* and *Trepel* stand in sharp contrast to this case, in which defendants' claim of reliance on the broker is not only supported by the sworn account of their principal (Gjonaj) of when he received each document and sent it to the insurance broker (ARM), but is also corroborated by the affidavit of the particular ARM broker who serviced defendants' account. The ARM broker (Sarasky) acknowledges having received the papers from Gjonaj, having forwarded the papers to ARM's claims department, and having assured Gjonaj "that all was being taken care of." Sarasky further admits the error of ARM's claims department in sending the papers to the wrong carrier—very much as occurred in *Mendoza*, in which we held excusable a default that resulted when the defendant's "broker misdirected the complaint to the wrong insurer" (227 AD2d at 302). Moreover, defendants' reliance on their ARM broker and his assurances was certainly reasonable, since, as attested by both Gjonaj and Sarasky, it had been Gjonaj's practice for years prior to these events to send all legal papers he received to ARM, in the expectation that ARM would forward the documents to the appropriate liability carrier, as it had done consistently in all previous cases.

It is undisputed that defendants moved to vacate their default two months after Gjonaj received a copy of the post-inquest order directing entry of judgment in the amount of $900,000. Unaccountably, in spite of plaintiff's own dilatory conduct in prosecuting this action (he waited nearly a year to move for a default judgment and then, after that motion was denied based on the lack of an affidavit of merit, another year to make a second motion), the majority seizes on the two-month gap between Gjonaj's receipt of the order and the motion to vacate as somehow constituting evidence of gross negligence on

defendants' part.[2] Of course, once Gjonaj realized from the order awarding damages that the matter was not being defended, some time was required to determine whether defendants' carrier would undertake the defense, for defendants to retain counsel on their own, and for that law firm to familiarize itself with the action and to prepare motion papers. I believe that, seen in this context, the two-month gap was not unreasonable.

The remaining factors to be considered on a motion to vacate a default also support affirming the order granting that motion. As to whether defendants have a meritorious defense, it seems doubtful that there is any basis for a negligence or Labor Law § 200 claim against defendants, who apparently retained plaintiff's employer and did not supervise or control his work, and it is not at all clear from the face of the complaint whether plaintiff's work as a "camera installer" falls within the scope of Labor Law § 240 (1).[3] Further, I see no merit in the majority's assertion that plaintiff would be prejudiced if the action were now required to be decided on the merits. Plaintiff was allegedly injured on May 7, 2010, and commenced the instant action on December 27, 2010. As previously noted, plaintiff proceeded to wait *almost an entire year*, until December 26, 2011, to move for a default judgment, and then did so without submitting an affidavit of merit. After plaintiff's defective initial motion for a default judgment was denied, *he waited almost another year,* until October of 2013, to execute an affidavit of merit and renew the motion for a default judgment. Plaintiff offers no excuse for either of these delays, nor does he claim that his counsel made any inquiry of defendants to learn why they had not answered or otherwise appeared in the action. Given plaintiff's own dilatory prosecution of this matter and "the strong public policy of this State to dispose of cases on their merits" (*Rodgers*, 69 AD3d at 511), I would give short shrift to plaintiff's present assertion that he will somehow be

2. Notwithstanding the majority's claim that its result is based on "the totality of defendants' conduct," the emphasis it places on the final two months before defendants moved to vacate their default suggests that the majority itself silently recognizes that defendants' prior reliance on the assurances of their insurance broker that the matter was being defended was, even if negligent, excusable.

3. The majority can find only one decision, which is from the Second Department and has never been cited by this Court, to support its view that this case is "within the ambit of the Labor Law." Whether camera installation—the activity plaintiff claims to have been performing—falls within one of the categories of work covered by Labor Law § 240 (1), namely, "erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure," is a question that defendants should have an opportunity to litigate on the merits in this action.

prejudiced if we affirm Supreme Court's order requiring him to prove his case.

In sum, while I agree with the majority to the extent it vacates the $900,000 judgment and directs that a new inquest be held, I believe that we should simply affirm Supreme Court's provident exercise of its discretion to vacate defendants' default in its entirety and allow the matter to be adjudicated on the merits as to both liability and damages. To the extent the majority does otherwise, I respectfully dissent.[4]

---

**4.** It bears noting that the majority, even while it emphatically denies that defendants' default was excusable, actually excuses that default, in part, by vacating the award of damages and directing that a new inquest be held.